THE SECURITY TRUST COMPANY

*v.*

MARY TARPEY.

*Opinion filed October 19, 1899.*

1. INSURANCE—*when policy will not be forfeited for alleged false statements.* A life insurance policy issued by a company engaged in the insurance of sub-standard risks and upon a copy of the application which the insurer knew had been rejected by another company, is not forfeited because of a statement in the application, which was true when made, that applicant had not been previously rejected.

2. SAME—*fraud cannot be based on physician's opinion if the facts are truthfully stated.* A charge of fraud sufficient to avoid a life insurance policy cannot be based upon the examining physician's opinion, when accompanied by a correct statement of the facts upon which the opinion rested.

3. SAME—*forfeiture cannot be based on cause within agent's knowledge when issuing policy.* An insurance company cannot insist upon the forfeiture of a policy for a cause within the knowledge of its agent at the time the policy was issued.

*Tarpey* v. *Security Trust Co.* 80 Ill. App. 378, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on writ of error to the Superior Court of Cook county; the Hon. HENRY V. FREEMAN, Judge, presiding.

WHEELOCK & SHATTUCK, for appellant.

DOUTHART & BRENDECKE, for appellee.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

The appellant, the Security Trust Company, filed its bill of complaint in the superior court of Cook county, praying for the cancellation of two policies of insurance on the life of William C. Cummings, one for $3000 and the other for $2000, payable to his sister, the appellee, Mary Tarpey. William C. Cummings answered the original bill and Mary Tarpey demurred to it, but Cummings died leaving Mary Tarpey sole defendant, and the bill was amended accordingly. The grounds upon which the amended bill asked to have the policies canceled were, that in the application therefor Cummings falsely and fraudulently answered that he had not made application for life insurance and been rejected, when in fact he had been rejected by the Iowa Life Insurance Company; that he stated his health was good, when he knew that it was not and that he had consumption; that he warranted these statements to be true while they were false and made with intent to deceive complainant, and that he obtained the policies by means of said false and fraudulent representations. By her answer to the amended bill defendant denied that Cummings made false representations, and alleged that complainant was organized for carrying on the business of insuring people who were in bad health and had been rejected by other companies; that for its policies complainant charged a premium far in excess of what other companies charged, and that it knew all the facts and circumstances concerning Cummings' health and his relation with other insurance companies. The defendant also filed her cross-bill, praying that an account should be taken of the amount due on the policies and that complainant in the original bill should be decreed to pay the same. The cross-bill was

answered, and replications being filed, the chancellor heard the cause and entered a decree dismissing the cross-bill and declaring the policies void. On a writ of error from the Appellate Court the decree was reversed, and the cause was remanded to the superior court with directions to dismiss the bill and to enter a decree in accordance with the prayer of the cross-bill.

The material facts proved are as follows: The complainant, the Security Trust Company, is a corporation organized under the laws of Pennsylvania and doing business in the State of Illinois. In October, 1895, Norman Kellogg was the general agent of complainant in Chicago, and advertised that the company would take sub-standard risks,—such as had been rejected by other insurance companies. On October 5, 1895, William C. Cummings, at the solicitation of Harry Bate, an agent of the Iowa Life Insurance Company, made application to that company for a policy of insurance of $5000. On the following day Cummings was examined by the regular physician of said insurance company and signed a statement containing the following: "Have not now nor have ever had disease of lungs. I have had pneumonia. I have never made application to any life insurance organization which was denied." The report of that examination showed the number of respirations per minute to be twenty-two; that there was a prolonged expiratory murmur at the apex of the right lung, and the physician gave it as his opinion that, compared with the average of lives of the same age and sex, he considered the chances of life of Cummings to be bad, and that if he himself were in the business he would not insure the subject for life nor for a limited term of years. The agent, Bate, knowing that Cummings would be rejected by the Iowa Life Insurance Company on this examination, went to Kellogg, the general agent of complainant, in pursuance of the advertisement requesting insurance agents that might have rejected risks to turn them in to complain-

ant, and stated that he had a man who was going to be rejected.  Kellogg explained to Bate and his partner, Louis Neuer, the objects and purposes of his company, and gave them a pamphlet issued by complainant, showing how to present applications and how to turn in rejected applications from other companies.  The business of the company was stated to be insuring the classes of lives which are "sub-standard," including persons with physical imperfections, such as deformity, loss of a limb, eye-sight or hearing; occupations of an extra-hazardous nature; persons of overweight or underweight, or subject to attacks of acute disease, and those with unfavorable family histories, and those rejected by other companies. The premium was about thirteen per cent higher than that charged by companies which required good risks. The pamphlet stated that original applications made to other companies would be considered if not over ninety days old, or *verbatim* copies of original applications, duly certified by the rejecting company or a responsible general agent, might be used, but in all cases an original application must be signed by the applicant before the issue of the policy, and the physician originally making the examination must inspect the "risk" before the application was sent in, and make a satisfactory report.  Kellogg told these agents that a copy of the application to the Iowa company would be all right.  Kellogg gave the agents blanks of complainant, and on October 7, 1895, Bate made what he called a copy of the other application to be used with complainant, and the doctor made a copy of his report.  These supposed copies were made on blanks which Kellogg gave them, but the blanks were different from the blanks of the Iowa company, and as filled up neither of them was a *verbatim* copy, but they were to the same effect.  A few days afterward the agents went to Cummings and read to him from the pamphlet what risks complainant insured and about the use of the copies.  They asked him to sign the copies made as

above, telling him that they were copies of the previous application, and he signed them as such, without reading them. Bate took these papers and delivered them to Kellogg, telling him they were copies of the application to the Iowa Life Insurance Company. Kellogg read them and sent them to the complainant's home office, in Philadelphia. The physician who had made the examination certified on October 11, 1895, that he had inspected Cummings and there had been no change in his physical condition since the date of said examination. The application, like the original of which it purported to be a copy, represented that Cummings had no disease of the lungs. The purported copies of the examination contained the following: "Are the respiratory organs (lungs, pleura, larynx, etc.,) free from any indication of disease?—No. Is the respiration full, easy and regular?—No. Number of respirations per minute?—22. Rate of pulse? (full minute) —85. Do you consider the risk first-class, fair or bad? If fair or bad, give reasons.—Fair; prolonged expiratory murmur at the apex of the right lung. Do you recommend the risk?—Yes." The policies were issued and sent to Kellogg, and he was then fully informed that Cummings had been rejected by the· Iowa Life Insurance Company. With that knowledge Kellogg delivered the policies to Bate, who took them to Cummings and delivered them and collected the first quarterly premiums, giving the money to Kellogg. On October 31, 1895, complainant had Cummings examined by its medical examiner, and about that time tendered back the premiums paid and demanded back the policies. When the next premiums became due they were tendered and refused. Cummings' health remained apparently fair until the latter part of December, 1895, when quick consumption became manifest and ran a very rapid course until February 22, 1896, when he died.

The rules of complainant permitted the use of a copy of a rejected application made to any other company,

and its general agent, Kellogg, informed Bate and Neuer, and they informed Cummings, that such was the rule. Complainant was seeking rejected applications and advertising for them. Kellogg knew that the application had been made to the Iowa company, and the only probability of securing it for complainant depended upon its being rejected by the other company. It would be doing violence to the understanding of the parties to say that a copy of the rejected application might be used, and yet that the fact of its having been rejected would render its statement that there had been no previous rejection false and fraudulent. The statement in that respect was strictly true when made, and a copy of it was used at complainant's suggestion. Complainant sought a court of equity for the protection of its interests in the transaction, and such a court will give no heed to a claim that a copy of a truthful statement made to the Iowa company became a false statement made to deceive complainant.

The other statement alleged in the bill to have been false and fraudulent and to have constituted a warranty is, that he was in good health when he knew that he was not. He did not read the statement which was presented to him as a copy, but it is insisted by counsel that he was bound to do so and that he became responsible for whatever it contained. Assuming that to be so, we can not see that the conclusion on the question of fraud or warranty will be affected in any way. While the supposed copy was not exactly the same as the original application to the Iowa company, and what was called a supplementary application differs somewhat, they all amounted to substantially the same thing. In each he represented himself to be in good health. The report of the examination would indicate to a physician a probability of tuberculosis, but the doctor who made the examination testified that the indications might or might not point to such a disease; that there was a small area of consolidation of the lung,—not enough to cause any

inconvenience to Cummings; that it would not necessarily interfere in any way with him and that he might not know he was sick at all. If he concluded that Cummings probably had the disease he did not inform him, but advised him to consult a specialist, and if it was not tuberculosis it would make no difference, but if it was he should go to a different climate. There were eight witnesses, who were neighbors and intimate acquaintances of Cummings, who testified that he appeared to be in good health, and the evidence justifies the belief that he supposed himself to be in a fair state of health. He, of course, knew that he had been rejected by the Iowa company and that he was not a good risk for any company that required absolutely sound individuals, but it does not follow that he did not honestly consider himself eligible for insurance by complainant upon paying the higher premium demanded for insuring such risks as it took. Complainant insured those who had been rejected by other companies and charged an increased rate for taking increased risks. It was organized for the sole business of insuring extra-hazardous cases, for which it charged thirteen per cent higher premium than companies insuring sound and healthy persons. No sound person would insure in such a company and pay the higher premium, and complainant could not have expected any such thing. Although the germs of the disease were undoubtedly present, yet the disease had not become manifest to either Cummings or his most intimate associates, and the evidence does not show any intent to deceive the company. But however that may be, complainant knew as much, or more, about his condition than he did. It was fully informed of all the facts, and they were as well known to it when the policy was issued as they are to-day. It had before it the information in the medical examination that the lungs were not free from the indication of disease; that the respiration was not full, easy and regular; that the number of respirations per minute

was twenty-two; that the rate of pulse (full minute) was eighty-five, and that there was a prolonged expiratory murmur at the apex of the right lung.    These facts are shown by the evidence to indicate to a physician the probability of the disease of which Cummings died.    Complainant was fully cognizant of all these facts, and the general agent who delivered the policies knew that Cummings had been rejected by the Iowa company.

It is argued that the examining physician was not the agent of complainant and that he fraudulently concealed facts from the company.    The charge of fraud is not true. He stated the facts fully and truthfully.    The representation insisted upon as fraudulent and false consisted in this question and answer in the examination:    "Do you consider the risk first-class, fair or bad?    If fair or bad, give reasons.—Fair; prolonged expiratory murmur at the apex of the right lung."    This was but a mere statement of opinion, accompanied by a correct statement of the facts upon which the opinion was based.    He did not give an opinion that the risk was first-class, but gave it as fair, and what would be a bad risk for another company might justly be considered a fair risk for complainant, because it only proposed to take risks which were bad for other companies.    There was no deception, and a charge of fraud cannot be based on such a statement of opinion.

It has been the rule of this court that an insurance company cannot insist upon the forfeiture of a policy for a cause which was within the knowledge of its agent at the time the policy was issued, and under the facts of this case it would be inequitable to permit complainant to say that the policies were obtained by fraud and deception, or that there was a warranty contrary to facts which were fully known to it when the policies were issued and delivered.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*