Edward Schmidt, Guardian of the Estate of Jack Locke, also Known as Herbert Jacke Locke, a Minor, Appellee, v. The Prudential Insurance Company of America, Appellant.

Gen. No. 38,604.

Opinion filed December 9, 1936.

HOYNE, O'CONNOR & RUBINKAM, of Chicago, for appellant; NATHANIEL RUBINKAM and WILLIAM S. ALLEN, of Chicago, of counsel.

JOHN E. TIMM, of Chicago, for appellee.

MR. JUSTICE HALL delivered the opinion of the court. By this appeal, defendant seeks the reversal of a judgment against it for the sum of $500. The action is based upon an insurance policy for the sum of $500, issued by the defendant to Helen Locke on December 16, 1933. The beneficiary in the policy is Jack Locke, son of the insured. Helen Locke died on June 12, 1934. The trial was before the court and a jury, which trial resulted in a verdict for the plaintiff in the sum of $500, upon which the judgment appealed from was entered.

In the statement of claim filed in the municipal court of Chicago, it is alleged that the policy men-

tioned was issued on December 25, 1933, on the life of Helen Locke, that she died upon the date mentioned, that all the premiums required by the terms of the policy had been paid, and that the amount of the policy had not been paid to the plaintiff.

In its affidavit of merits, defendant admits the issuance of the policy, and states that it was issued to Helen Locke, the insured, in pursuance of an application containing certain questions and answers, attached to the policy, and which became a part of the policy. The questions and answers referred to, and which it is claimed were propounded to and were answered by the insured, are as follows:

"What is the present condition of health of life proposed?
Good
When last sick? Month, Year.
Never
Of what disease?
None
Does any physical or mental defect exist?
No
Has life proposed ever suffered from consumption, asthma, spitting of blood, habitual cough, apoplexy, paralysis, heart disease, insanity, fits or convulsions, rheumatism, gall-stones, disease of the gall bladder, liver or kidneys, cancer, ulcers, tumor, dyspepsia, syphilis, influenza, obstinate constipation or accident of any kind?
No to all.
Has life proposed ever received treatment by a physician or at a dispensary, hospital or sanitarium? If so, state where, when and for what illness.
Has life proposed ever had pain or distress in the chest or abdomen, dizziness, shortness of breath on walking in the cold air, uphill or upstairs?
No."

It is also alleged in the affidavit of merits that appended to and made a part of the application which was signed by Helen Locke, is the following:

"I hereby declare that all of the statements and answers to the above questions are complete and true, and I agree that the foregoing, together with this declaration, shall constitute the application and become a part of the contract of insurance hereby applied for, provided a copy hereof shall be attached thereto. I further agree that the policy herein applied for shall be accepted subject to the privileges and provisions therein contained, and that unless the full first premium is paid by me at the time of making this application, the policy shall not take effect until issued by the Company and received by me and the full first premium thereon is paid, while the health and occupation of the life proposed are the same as described in this application. It is understood and agreed, however, that if at the time of signing this application the full first premium is paid, the insurance shall take effect from the date of this application, in accordance with the provisions of the policy hereby applied for, provided life proposed is in sound health on the date of this application and provided this application is approved and accepted at the Home Office of the Company, in Newark, New Jersey, under the plan, for the premium paid and amount of insurance applied for. . . .

"(Signed)  Helen Locke"

It is further alleged in the affidavit of merits that she, the insured, was not in sound health on the date of the application; that the proofs of death show that the immediate cause of death was multiple fibroid tumors of the uterus, with prolapse and that the date of the inception of the disease causing her death was two years prior to the date of her death, which date of inception antedated the date of the application for the

policy; that she consulted a physician in August, 1931, for chronic cholecystitis, and in February, 1933, she was operated on for hernia and was confined in a hospital; that a diagnosis of her condition in 1933 indicated that she was suffering from a disease of the gall bladder, prolapse of the womb, cystocele, rectocele, prolapse of uterus, third degree, right inguinal hernia, and systic ovary, right side; that the defendant was not liable for any amount except the premiums which were tendered.

To this affidavit of merits, the plaintiff, guardian of Jack Locke, filed a replication, which is, in substance, as follows:

"That at the time and prior to the execution of the application by Helen Locke, for the insurance policy sued on herein, one O. M. Vogel, an agent of the defendant, had knowledge of the fact that said Helen Locke had been ill prior to the execution of said application and had been a patient in a hospital in February, 1933, at which time said Helen Locke was operated on for hernia.

"Wherefore affiant says, that the knowledge of said agent of said illness and operation, thereupon became imputed to the defendant and that therefore if said Helen Locke made any misrepresentation as to the condition of her health, said misrepresentations were not material to the risk, nor did she perpetrate any fraud as a result thereof upon the defendant, and that therefore said contract of insurance is not void inasmuch as the defendant has waived its right to insist upon such forfeiture because of the knowledge of said agent." In this replication it is not denied that the insured agreed that the answers made by her were true, and that by the terms of the policy, her answers to the questions should form a part of the insurance policy applied for.

Otto M. Vogel, a witness for the plaintiff, testified, in substance, that he was formerly employed by the

defendant company; that he knew the insured in her lifetime; that he knew her for three years prior to December, 1933, and that, "I think I assisted in the selling of insurance," meaning the policy involved in this case; that he was present at the time the application for the policy was filled out; that the parts of the application for insurance signed by the insured which are in the handwriting of the witness, are the place of birth, date of birth, occupation, nature of employer's business, exact duties and height and weight, and that the other answers in this application are in the handwriting of Mr. McGuire, meaning George F. McGuire, Jr., a witness produced by the defendant as hereinafter noted. This witness further testified to the effect that he had a conversation with reference to the health or condition of Helen Locke prior to the date of the application made on December 16, 1933, with Mr. Schmidt, plaintiff, in his home about a year before the witness wrote certain answers to certain of the questions in the application for insurance; that Mr. Schmidt paid for the insurance; that the witness asked Mr. Schmidt where the insured was, and that Mr. Schmidt replied that she was sick, that she was in the hospital at the time for a minor operation, and that she had nothing serious the matter with her. This witness testified that he had no recollection of having talked to the insured about her health, and that she looked all right to the witness. On cross-examination, this witness further testified that it was about a year before December, 1933, that he had this talk with Mr. Schmidt, and that he left the Prudential Company prior to the delivery of the policy to the insured.

George F. McGuire, Jr., referred to by Vogel in his testimony, testified that Vogel did not inform him that Mr. Schmidt had told him, Vogel, that the insured was in a hospital for some slight ailment at the time the witness made out her application for insurance, and

that the witness did not know she had been in the hospital until the day of the trial.

Dr. Nelson M. Percy, a witness on behalf of the defendant, testified that he first met the insured professionally on August 10, 1931, at which time he examined her; that he found her suffering from chronic cholecystitis and laceration of the cervix, a small tube of the uterus; that chronic cholecystitis means chronic infection of the gall bladder; that laceration of the cervix means tearing of the mouth of the womb caused by childbirth; that laceration of the perineum means the same thing, tearing of the perineum following childbirth, and that in addition, she had a prolapsed uterus and that she had some small fibroid tumors. This witness testified that the next time he saw the insured was on October 2, 1931; that at that time, the witness made an examination of the insured and found nothing different from the first examination; that he saw her three times before she entered the hospital on May 30, 1934, and that from that time until her death on June 12, 1934, the witness saw the insured twice daily. This witness further testified that his daily treatment began on May 30, 1934; that in May, 1934, she was suffering from the same condition which he found in August, 1931, and that he saw her daily at the Augustana Hospital. This doctor testified that when he made the examination of the insured, he obtained a history, and that the insured told the witness she had had an operation for drainage of the gall bladder 11 years previous. The doctor further testified that he informed the insured as to what he found by his examination; that her death followed an operation for perineal cystotomy, for removal of multiple fibroid tumors of the uterus with prolapsus; that as a contributing cause, she developed an acute dilatation of the stomach and that the disease from which she suffered, had existed for several years prior to her death.

Dr. Hans Rudolph Uterhart, a physician and sur-geon produced as a witness for defendant, testified, in substance, that six or seven years prior to the trial, he had examined the insured and administered certain treatment to her, and that on February 7, 1933, he operated on the insured at the Belmont Hospital for a right inguinal hernia; that she was in the hospital from February 7th to February 21st, of the same year. This doctor further testified that prior to the opera-tion, he examined the insured, and that the objective symptoms revealed a scar around the gall bladder, which, in his opinion, had existed for many years, and that the scar indicated that an operation had been per-formed. The court propounded the following question to this witness: "Is there anything else about the case you can tell us now?" The witness answered: "She had hypertrophy of the cervix of the womb. Hyper-trophy is an enlargement of the womb that does noth-ing to the general health. She was a small fat lady and heavy, but otherwise, as far as I know, healthy." The doctor further testified that the insured had com-pletely recovered from her operation.

The facts as to the physical condition of the insured at the time she made the application for insurance are not disputed.

In *Western & Southern Life Ins. Co. v. Tomasun,* 358 Ill. 496, a bill was filed to cancel a life insurance policy upon the ground that false representations had been made by the insured as to facts material to the risk. In holding that such false answers voided the policy, the Supreme Court said:

"In an equitable action for the cancellation of an insurance policy upon the ground that misrepresenta-tions had been made as to facts material to the risk, it is not essential that the applicant should have will-fully made such misrepresentations knowing them to be false. They will avoid the policy if they are, in

fact, false and material to the risk even though made through mistake or in good faith. In *United States Fidelity and Guaranty Co. v. First Nat. Bank,* 233 Ill. 475, we stated this rule in the following language: 'The law is well settled, in its application to insurance contracts, that a misrepresentation of a material fact, in reliance upon which a contract of insurance is issued, will avoid the contract, and it is not essential, in equity, that such a misrepresentation should be known to be false. A material misrepresentation, whether made intentionally or knowingly or through mistake and in good faith, will avoid the policy.' The same rule has been applied in many other jurisdictions.

"We find the authorities firmly established that it was not necessary to an avoidance of the policy that Mrs. Tomasun should know that her answers were untrue, altho that she did know them to be untrue we can hardly find room to doubt upon the record presented. On the day she signed the application she consulted Dr. Orndoff regarding her health and on the next day was operated on in the North Chicago Hospital. She was not in sound health on June 5 or June 6, 1928, nor on the date she received the policy. Neither had she been in good health for many months previous thereto, and it is impossible to believe that any woman who had suffered the severe abdominal operation which she underwent about six months prior to her application, and who had since been under constant medical observation and treatment, could have in good faith considered herself an insurable risk in any life insurance company. Regardless of her knowledge or lack of knowledge of the truth of her statements, it has been held by the highest authority that having accepted and retained the policy of insurance, with the copy of her application attached thereto, she is bound by it. Regardless of her knowledge on June 5, it cannot be urged with any degree of plausibility

that she considered herself in good health when the policy was delivered two weeks later, and it became her duty during that interim—*i. e.,* after her examination and before the delivery of the policy—to disclose the changed condition in her health to the insurer. On this point the Supreme Court of the United States has said: 'But the reason for the rule still obtains, and with added force as to changes materially affecting the risk which come to the knowledge of the insured after the application and before the delivery of the policy, for even the most unsophisticated person must know that in answering the questionnaire and submitting it to the insurer he is furnishing the data on the basis of which the company will decide whether by issuing a policy it wishes to insure him. If, while the company deliberates, he discovers facts which make portions of his application no longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure. If he fails to do so, the company may, despite its acceptance of the application, decline to issue a policy.' *Stipcich v. Metropolitan Life Ins. Co.,* 277 U. S. 311.'' Because the facts in the case cited are so similar to those in the instant case, we have quoted quite extensively from the opinion.

In view of the conditions in the contract, and of the undisputed facts as to the history and physical condition of the insured prior to and at the time of its execution, plaintiff had the burden of proving, by a preponderance of the evidence, that the insured did not knowingly and intentionally misstate the salient facts when she stated that the condition of her health at the time of the signing of the application was good, that she was never sick, that she had no disease, that she had no physical defect, that she had never suffered from disease of the gall bladder, and that she had never received treatment by a physician at a dispensary, hospital, sanitarium or otherwise. This he has

failed to do. Therefore, the judgment of the municipal court is reversed and it is ordered that judgment be entered here against the plaintiff for costs.

*Reversed and judgment entered here for costs.*

Denis E. Sullivan, P. J., and Hebel, J., concur.