## Mildred C. Asselborn, Plaintiff-Appellee, v. State Farm Life Insurance Company, Defendant-Appellant.

### Gen. No. 10,708.

Opinion filed January 4, 1954.
Released for publication January 13, 1954.

KNIGHT, HAYE & KEEGAN, of Rockford, and FEARER & NYE, of Oregon, for appellant.

RAPHAEL E. YALDEN, of Rockford, for appellee.

MR. PRESIDING JUSTICE DOVE delivered the opinion of the court.

Mildred C. Asselborn, instituted this action against the State Farm Life Insurance Company to recover on a life insurance policy issued by the Company upon the life of her deceased husband, Joseph C. Asselborn.

The complaint alleged that the defendant issued the policy on May 8, 1952 and that the insured, Joseph C. Asselborn, died while said policy was in full force and effect and that the insured and the plaintiff had performed all of the conditions imposed upon them by said policy. The answer of the defendant admitted the execution of the policy and set forth portions of the insured's application for the policy and averred that in the application the insured made statements as to his past physical condition and medical treatment which were false and material to the risk and which were known by said insured to be false. The plaintiff in her reply denied the allegations of this affirmative defense. The issues thus made were submitted to the court for determination, without a jury, resulting in a judgment in favor of the plaintiff and against the defendant for $42,756.07 and the defendant appeals.

The record discloses that Joseph C. Asselborn, the insured, was born on November 30, 1912, and for eight years prior to his death owned and operated an asparagus farm near Rochelle, Illinois where he and his family lived. On May 8, 1952 he made application to the agent of appellant at Rochelle for the policy which forms the basis of this suit. The next day, at the request of the agent, he went to the office of Dr. C. H. Schaller at Rochelle for his physical examination. The application which was made a part of the policy discloses that the insured was asked the following questions and made answers thereto as noted by the physician, viz.: "Has proposed insured had any special study, X ray, E.K.G. Blood sugar, blood serology or other blood chemistry?" Answer: "Yes, E.K.G. taken just for check up, always normal." Another question: "Does proposed insured have, or has proposed insured ever had, any signs or symptoms of or suffered from any ailment or disease of heart, blood-vessels or lungs?" Answer: "No." In response to the question for

the name and address of the physician he usually consulted, he answered "Dr. Zack, Rochelle, Illinois." Question: "When and for what did proposed insured last consult him?" Answer: "Nothing." Question, "Is proposed insured in sound health, free from disease and without deformity, loss or impairment of limb, sight, hearing and speech?" Answer: "Yes." In answer to the question that required the proposed insured to state the particulars of all diseases, injuries, ailments, or surgical operations he had had or for which he had been under treatment, observation, or diagnostic study in the past ten years the answer was "none." To the final question whether he had consulted a physician, specialist or other practitioner or been under medical care in the past ten years, for any reason not stated above, the answer was "no."

Dr. Schaller, one of the examining physicians for appellant testified that during the course of his examination of the insured he took his pulse and blood pressure, and after doing so required him to hop around and exercise and then took his pulse and blood pressure again: that the examination of the heart showed nothing significant: that there were no murmurs or irregularities and that his blood pressure was 124/80 all the time and that his heart was normal in size and not enlarged. This witness was then asked the following question by counsel for appellant: "At the time you signed defendant's Exhibit 4 (the medical examiner's report) did you know at that time or did Mr. Asselborn tell you that in the month of March, 1952, Dr. Zack was called to his home at his request because of pains that Joseph C. Asselborn was then having in the upper part of his stomach, did he tell you that?" And the physician answered: "Yes" and stated that the insured had also told him he had had some electrocardiograms which the physician noted on his medical history report. One of the questions which the examining physician was re-

107

quired to answer and which appears upon the doctor's report to the company was: "Do you unreservedly recommend this proposed insured as a first-class, average or fair risk?" Doctor Schaller recorded as his answer to this question, "First-class."

Dr. William O. Townsend, the other examining physician for appellant, also testified upon the trial. His report to the company, dated May 10, 1952, discloses that he had known the insured for six years; that he, Dr. Townsend, was the physician the insured usually consulted; that insured had consulted Dr. Townsend because the proposed insured was slightly overweight; that proposed insured had had a complete physical check-up in February 1952, and was put on a mild reduction diet. In answer to one of the questions, the proposed insured stated he had fractured his left elbow in 1921 and, other than as noted, he had not been under medical care in the past ten years. In his report, Dr. Townsend gave the results of his heart examination, and to the question "Do you unreservedly recommend this risk as a first-class, average or fair risk?" Dr. Townsend answered: "First-Class."

The record further discloses that about June 10, 1952, the policy dated May 8, 1952, was delivered to the insured. The harvest of asparagus was completed about July 1, 1952. During the three-month season preceding that date, the insured worked regularly cultivating and fertilizing the crop, and supervising the cutting and hauling of the crop to the canning factory.

On July 2, 1952, the insured, accompanied by his wife and two children aged thirteen and fourteen respectively, left their home in Rochelle by automobile for Northern Wisconsin. On July 3rd he examined some property which he was considering purchasing as a summer home. On July 4th he was at Sand Lake near Spooner, Wisconsin. In the morning and afternoon of that day he rowed a boat on the lake and fished. Before

eating his evening meal he complained of a severe pain in the chest. A physician was promptly called, and he was removed to a hospital at Shell Lake where he died the following afternoon about one o'clock. The death certificate signed by the attending physician gave the immediate cause of his death as acute coronary thrombosis.

The record further discloses that the insured was the owner of eighty acres of land near Rochelle valued at $40,000 and also the home where he and his family lived in Rochelle. In the early part of 1952 he purchased an additional 160 acres of land for $45,000, paying $5,000 cash therefor and executing a note, secured by a mortgage upon the land purchased as well as his other real estate. This transaction was completed on April 24, 1952. The evidence is further that during this time he was contemplating the purchase of additional life insurance.

Dr. Russell W. Zack attended the insured at his home on the evening of March 6, 1952. He testified that he found the insured sitting in a chair in his home and that he complained of pain in his left shoulder, left arm and the substernal area; that an examination disclosed nothing remarkable; that his blood pressure was normal and his pulse regular; that he made no diagnosis but gave him a tablet of nitroglycerine to place under his tongue in order to relieve his pain. On March 7, 1952, Mr. Asselborn went to Dr. Zack's office in Rochelle as the doctor had requested the day before. At the direction of Dr. Zack, who shares offices with Dr. Townsend, an electrocardiogram was made, and Asselborn was given a prescription for some nitroglycerine tablets to be used by him in case he had more pain. Prior to this date and on February 26, 1952, Dr. Townsend had made an electrocardiogram of Mr. Asselborn and on May 16, 1950, an electrocardiogram had also been made, and these recordings were all sent to Dr. Shea-

gren, an expert, for interpretation. None of them disclosed any myocardial damage or coronary insufficiency and were normal electrocardiograms, and the evidence is that those obtained in 1952, when compared with the one obtained in 1950 showed no changes of significance. The evidence is further that on March 14, 1952, and again on March 31, 1952, Asselborn returned to Dr. Zack's office as requested and reported to the doctor each time that he was feeling fine, had had no recurrence of pain, and the doctor found that his condition, including his blood pressure, was normal.

Counsel for appellant contend that the insured did not state to his medical examiners all diseases and ailments for which he had been under treatment for the past ten years and when he did state on his medical examination that he did not have and had not had any signs or symptoms of any ailment or disease of the heart or blood vessels and told Dr. Schaller that these electrocardiograms had been "taken just for check up" and answered that he had consulted Dr. Zack for "nothing," he, the insured, was obviously and patently telling falsehoods and knew these answers were false. Counsel further insists that irrespective of insured's knowledge of the falsity of these answers, they were material to the risk and, therefore, there can be no recovery under this policy.

In support of this contention, counsel state that the evidence shows that the insured consulted his family physician, Dr. Zack, in March 1950, and in March 1952, at which times the doctor prescribed sedatives and deemed it necessary to have electrographic studies made and upon the latter occasion administered nitroglycerine and prescribed additional tablets of the same kind if the pain recurred. Counsel also call to our attention the fact that the insured died of acute coronary thrombosis due to coronary arteriosclerosis and that at the time he was taken to the hospital at Shell Lake,

110

Wisconsin, the insured told Dr. Olson that he had been treated for a heart condition the previous spring. Counsel also refer to the testimony of Dr. Arthur R. K. Matthews who did an autopsy upon the body of Mr. Asselborn on March 26, 1953, his examination being a gross and microscopic one essentially of his heart and gall bladder. Dr. Matthews testified that he found the heart heavier and larger than normal and a marked arteriosclerotic condition in Asselborn's heart area and a recent thrombus, or clot formed from fibrin in the blood, in the anterior descending artery which supplies blood to the anterior lateral part of the left ventricle and that Asselborn's death was due to occlusion in this anterior descending artery. From all these facts counsel conclude that the insured must have known he was not a well man when he made his application for the policy sued on and that when he took the nitroglycerine tablets prescribed by Dr. Zack he must have known that he had a specific coronary condition.

Dr. Perry A. Anderson testified on behalf of the defendant than an electrocardiograph is essentially a galvanometer which records electric currents on moving paper and that it records changes in the heart as it beats, and Dr. Zack testified that it is generally used by the medical profession to determine a patient's heart condition. Dr. Anderson testified that to a trained electrocardiographer the nature, type and place of heart damage will be indicated by an electrocardiogram but that the electrocardiograph will not necessarily reflect arteriosclerotic conditions and that it is not accepted diagnostic medical practice to rely alone on electrocardiograms to determine heart damage because there may be areas of injury that cannot be picked up and other factors may distort tracing of impulses.

What the record discloses with reference to Dr. Olson's testimony is that on July 4, 1952, Dr. Olson was called to attend the insured at Shell Lake, Wisconsin,

and when he first saw him that evening, Dr. Olson testified that Mr. Asselborn told him that he, Asselborn, had previously had trouble with his heart. Mrs. Asselborn testified that she was with her husband all the time Dr. Olson was in attendance of her husband and heard what was said and that Asselborn never told the doctor that he had ever had heart trouble. The trial court, in deciding this case, commented upon this evidence and gave credence to the testimony of Mrs. Asselborn.

Section 154 of the Illinois Insurance Code provides that no misrepresentation or false warranty made by the insured shall void a policy of insurance unless it shall have been made with actual intent to deceive or materially affect either the acceptance of the risk or the hazard assumed by the company (Ill. Rev. Stat., 1953, chap. 73, par. 766, sec. 154) [Jones Ill. Stats. Ann. 66.829].

Before an applicant for insurance could make a material misrepresentation as to his health with intent to deceive and defraud an insurance company, he must first have knowledge of such condition, otherwise there could be no intent. In *Minnesota Mut. Life Ins. Co. v. Link,* 230 Ill. 273, at pages 276-7, it is said: "It is well known, as is observed by the Supreme Court of the United States in *Moulor v. American Life Ins. Co.* 111 U. S. 335, that a person may have diseases of the presence of which in his system he has and can have no knowledge and which even skillful physicians are unable to discover after a most searching examination. It is therefore unreasonable that persons who organize corporations for the purpose of selling life insurance would exact a warranty of an applicant for insurance of the truth of a matter which, from the very nature of the injury, might be wholly unknown to the applicant, . . ." The court, in its opinion in *Minnesota Mut. Life Ins. Co. v. Link, supra,* commented on certain questions and answers appearing in the application in that case,

112

referred to the difference between the legal effect of a warranty and a misrepresentation and on page 278 quoted from *Moulor v. American Life Ins. Co.*, 111 U. S. 335, as follows: "The appellant was required to answer 'yes' or 'no' as to whether he had been afflicted with certain diseases. In respect to some of those diseases, particularly consumption and diseases of the lungs, heart and other internal organs, common experience informs us that an individual may have them, in active form, without at the time being conscious of the fact and beyond the power of any one, however learned or skillful, to discover."

The only evidence found in this record which might justify the inference that Asselborn knew that he had a bad heart is the testimony of Dr. Olson who stated that the insured told him that he had previously had trouble with his heart and the fact that electrocardiograms had been made and Dr. Zack had administered nitroglycerine and had given him a prescription for nitroglycerine tablets. We have already referred to Dr. Olson's testimony, and the evidence is that when Dr. Zack prescribed for the insured he told him that the nitroglycerine tablets were to be taken to relieve pain "regardless of where the pain was," and at that time it appears the pain from which he was suffering was in the upper part of his abdomen.

After reviewing the evidence, the trial court pointed out that at the time the insured applied for this insurance he was a young family man, thirty-nine years of age, who had just placed a $45,000 mortgage on his home and other real estate in order to purchase an additional 160 acres of land; that he had just purchased new machinery to cultivate that land; that just before he was fatally stricken he and his family contemplated the purchase of a summer home in Wisconsin, and at all time before the application for this policy was made and for almost two months thereafter he engaged in

strenuous physical labor; that he had consulted physicians who had examined him and who had familiarized themselves with three recordings of an electrocardiograph, and these physicians pronounced him normal and recommended him to appellant as a first-class risk. It is significant that one of these physicians was Dr. Townsend, one of appellant's medical examiners who made an electrocardiogram in February 1952. Dr. Townsend had this electrocardiogram read and checked by an expert and he, Dr. Townsend, received the report of the expert whose interpretation was: "Normal electrocardiogram—comparison with last E.K.G. of 5–16–50, there has occurred no change of significance." Insured had this information, and all of his conduct, demeanor, and activities are those which are associated with life, health, and a future outlook rather than those which are associated with illness, inactivity or death. The record does not disclose that the insured was ever advised or directed by any physician to take a bed rest or not to do any manual labor, and it is common knowledge that a bed rest and no work are prescribed and recognized as accepted treatment for a heart disorder.

It is also significant that not only Dr. Townsend but also Dr. Schaller, both medical examiners for appellant and whose duty it was to ascertain the actual facts as to the proposed insured's state of health, after thoroughly examining Asselborn and having all the information they possessed and acting for and on behalf of the interests of appellant, unqualifiedly recommended Asselborn to appellant as a first-class risk. The only reasonable conclusion that can be arrived at from this record is that appellant's physicians and especially Dr. Townsend knew as much about the condition of Asselborn's heart as Asselborn himself. Therefore, the insured could not have deceived appellant by his answers to the questions asked him. The medical reports of appellant's examiners accompanied the application for

114

the policy, and the discrepancies and incomplete answers appearing in the reports of the examiners, of which appellant now complains, were evident to appellant at that time. Appellant, however, without making further inquiry issued its policy.

█ On May 13, 1953, the judgment in this case was entered by the trial court. On May 21, 1953, a motion was made by the defendant that the court cause the record of the testimony of Dr. C. H. Schaller to be corrected. The portion of the record sought to be corrected is the answer to the question which was propounded to Dr. Schaller on cross-examination by one of defendant's attorneys. The question was: "At the time you signed this defendant's exhibit 4 (the medical examiners' report) did you know at that time or did Mr. Asselborn tell you that in the month of March, March 6, 1952, that Dr. Zack was called to his home at his request because of pains that Joseph C. Asselborn was then having in the upper part of his stomach, did he tell you that?" The transcript of the record discloses that the answer of the witness to this question was "Yes." In support of this motion appellant produced Dr. Schaller in court and requested permission to recall Dr. Schaller as a witness and also filed his affidavit in which the doctor states that his answer to this question was "no." In denying this motion and refusing permission to recall this witness, the trial court stated that the transcript of the court reporter showing that the answer of the doctor to this question was "yes" is correct; that the court kept trial notes and that his notes show the answer to this question was "yes," and that in addition to his notes, the court had an independent, distinct recollection of Dr. Schaller's answer to this question and that his answer was correctly reflected in the transcript prepared by the court reporter. The court then stated that the answer of Dr. Schaller to this question was only a part of the whole picture and did not, of

115

itself, affect the court's decision. In view of the entire record, the trial court did not err in overruling this motion.

In *Security Trust Co. v. Tarpey*, 182 Ill. 52, at page 59, it is said: "It has been the rule of this court that an insurance company cannot insist upon the forfeiture of a policy for a cause which was within the knowledge of its agent at the time the policy was issued." In the instant case, our review of the record convinces us that the agents of appellant knew as much or more about the physical condition of Joseph C. Asselborn at the time he made his application for this policy as Mr. Asselborn himself. The judgment of the trial court is in accordance with the facts as disclosed by this record and the applicable law, and that judgment will be affirmed.

*Judgment affirmed.*