Sylvia JACOBSON and American Cold
Hearing Corp., Plaintiffs-Appellants,

v.

EQUITABLE LIFE ASSURANCE SOCIE-
TY OF the UNITED STATES,
Defendant-Appellee.

No. 15401.

United States Court of Appeals
Seventh Circuit.

June 29, 1967.

Rehearing Denied Sept. 6, 1967.

Benjamin M. Becker, Robert A. Sprecher, Bernard Savin, Chicago, Ill., for plaintiffs-appellants.

Miles G. Seeley, Wm. Bruce Hoff, Jr., Burton E. Glazov, Lawrence R. Levin, Chicago, Ill., for The Equitable Life Assurance Society of the United States, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

Before CASTLE, KILEY and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Action by named beneficiaries to recover on two $50,000 life insurance policies issued by defendant Equitable Life Assurance Society of the United States (Equitable).[1] The jury returned a verdict for Equitable.

On February 16, 1961, the insured Morton Jacobson, dealing with David Dorin, an agent for Equitable, made an incomplete application for $100,000 life insurance. Mr. Jacobson was medically examined, Part II of the application "Statements to Medical Examiner" was filled in, and Jacobson signed the Part II. He did not sign the Part I which Dorin filled out that day indicating, among other things, that a $100,000 policy was desired. Both parts are required for a complete application.

In March, 1961, subject to the requirement that an acceptable Part I be submitted to it, Equitable offered to issue a policy of insurance in the amount of $100,000 on the life of Jacobson, and sent the policy to Dorin for delivery. Jacobson was "rated." The company insisted upon a class C premium [2] because Jacobson had high blood pressure. The parties had previous dealings. Equitable had issued a policy in 1952, had refused to insure him in 1956 because of high blood pressure, and had offered a policy in 1959 at a class B premium. Jacobson had declined this policy.

When Dorin attempted to deliver the $100,000 policy in March, 1961, Jacobson refused because the premium was too high.

Dorin made several attempts to persuade the company's doctors to reduce the rating. Additional blood pressure readings were taken in May, and the company refused to change the rating.

On June 20, 1961, Dorin visited Jacobson and his son at the office of plaintiff American Cold Heading Corporation, Jacobson's company. It was arranged that instead of a single policy of $100,000, two $50,000 policies would be issued. On one of these Mrs. Jacobson, present plaintiff, would be owner and beneficiary, and on the other the corporation. A form entitled "Application, Part I," was made out for each policy and signed

1. Jurisdiction is based on diversity.

2. The A rate is the standard premium, and applies where the insured is a standard

risk. Substandard risks are classified B through G, and increased premiums are charged.

by Morton Jacobson and the owner of the policy.

Jacobson died three months later, September 21, 1961. Immediate cause of death was coronary occlusion, caused in turn by coronary arteriosclerosis and general arteriosclerosis.

■ Defendant Equitable alleged that certain material answers in Part II were not true, full and complete, in compliance with the terms of Part I, signed by Jacobson on June 20, that the answer to question 7a was false when made in February, and that Jacobson was not in good health on June 20, when he signed Part I and paid the first premium.

Jacobson's answer to question 7a indicated that he had never "been treated for or had any known indication of * * * chest pain. * * *" The doctor who attended Jacobson the night of his death, in September, 1961, had notes that Jacobson told him: "Has mentioned off and on for a year or more to his wife that there has been mild chest pain but when it is over he forgets it and does not consult a physician." Mrs. Jacobson, and their son, as well as the family physician, testified they had not been told of such pains, and Jacobson, aged 52, had led an active life. The evidence of falsity may be meager, but there was sufficient evidence before the jury to support a finding that the answer to question 7a was untrue in February, 1961.

Another answer indicated that Jacobson had never "been treated for or had any known indication of any disease or disorder of the * * * blood vessels. * * *" There is no evidence that this answer was untrue in February, 1961. Part I, however, executed June 20, 1961, contained an agreement that "The foregoing statements and all those contained in Part II hereof are true, full, and complete, and are made to induce the Society to issue the policy or policies applied for. * * *" Before June 20, 1961, Jacobson had consulted physicians and received a diagnosis which would render the answer untrue as of that date.

Part I also contained the agreement, "Any insurance applied for shall not take effect unless the first premium thereunder is paid during the good health of the Proposed Insured. * * *" The same diagnosis disclosed a deterioration of Jacobson's health which had not been known at the time of the earlier examinations or the signing of Part II, and which, as the evidence showed, was not a natural incident of the condition of elevated blood pressure, known to Equitable, and for which Jacobson had been rated.

In summarizing the evidence we shall, unless we indicate otherwise, state it in the light most favorable to supporting the verdict.

In early June, 1961, Jacobson "had trouble walking. After walking about one block he developed pain in the right leg and had to stop and rest for a few minutes, at which time he could walk again; another block, and this continued to go on." [3] On June 7, Jacobson called on a relative, Dr. Shapiro, for advice about this trouble. Dr. Shapiro discovered that there was a poor pulsation at the right groin, and could not establish any pulsations behind the knee nor behind and on the inner side of the ankle, nor at the top of the foot.

Because Dr. Shapiro follows a rule that he does not treat his relatives, he named a group of physicians and suggested that Jacobson see one of them.

Accordingly, on June 12, Jacobson consulted Dr. Javid, a surgeon specializing in blood vessel and heart surgery. He found absence of pulsation similar to that found by Shapiro, and concluded that "there seems to be a blockage in the main artery above his liver." Dr. Javid told Jacobson "that he had blockage of the artery or occlusion of the artery and we had to make some tests to find out how extensive and how distant from the area of examination the blockage was." Javid said he would arrange for tests at Presbyterian St. Luke's Hospital, and that if it turns out that "only a short segment

3. The quoted material is testimony of Dr. Javid describing what Jacobson told him June 12.

of the artery is blocked, then of course surgery could be corrective." On June 14, Jacobson was notified that a reservation had been made at the hospital on June 27.

██ This was the information Jacobson had on June 20, when he signed a Part I for each policy and paid the first premiums. Although Jacobson had told Dorin, Equitable's agent, that he couldn't keep golf dates because his leg hurt him, and told Dorin that Dr. Javid said he would have to have surgery to relieve the nerve pressure which was causing the pain, Dr. Javid testified that he said nothing about any possibility that Jacobson's difficulty was caused by a pinched nerve. On this evidence the jury could scarcely fail to find that on June 20 Jacobson had a known indication of a disease or disorder of the blood vessels. The jury could also reasonably find that he knew or should have known that this was a change in the facts which would materially affect the risk, that he deliberately gave Dorin a less alarming explanation of the pain in his leg, and that Jacobson was not in good health on June 20.

After Jacobson went to the hospital on June 27, a dye test showed a blockage of the main tube that leads into the right leg and there was a diagnosis of generalized arteriosclerosis and arteriosclerosis obliterans. On June 30 the blocked segment was removed by operation and a pieces of plastic tube inserted. His recovery was "uneventful."

Jacobson apparently returned to normal activity. Two months later, however he became ill and died, within a few hours, of a coronary occlusion caused by general arteriosclerosis. His death was not related to the June 30 operation except in the sense that both the coronary occlusion and the blocked artery for which he had surgery stemmed from the same cause.

██ It appears, then, that although Jacobson agreed and represented on June 20, 1961, that all statements in Part II, including the answer that he had no known indication of any disease or disorder of the blood vessels were true, full, and complete, the answer just referred to was no longer true, and evidence clearly shows that the misrepresentation materially affected the acceptance of the risk and the hazard assumed by the company. The jury could reasonably draw the inference, moreover, that Jacobson's representation to Dorin that his leg pain resulted from nerve pressure was actually intended to deceive.[4]

██ And we think that, independently of the representation asked for and made on June 20 in the Part I, Jacobson had a duty to disclose to the insurer on that date the information he had tending to show a serious disorder in a blood vessel, an area about which Equitable had inquired.

In Stipcich v. Metropolitan Life Ins. Co.,[5] the Supreme Court said at p. 316, 48 S.Ct. at p. 513.

"But the reason for the rule [of disclosure] still obtains, and with added force, as to changes, materially affecting the risk which come to the knowledge of the insured after the application and before delivery of the policy. For even the most unsophisticated person must know that in answering the questionnaire and submitting it to the insurer he is furnishing the data on the basis of which the company will decide whether, by issuing a policy, it wishes to insure him. If, while the company deliberates, he discovers facts which make portions of his application no longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure. * * *"

This case has been followed in Illinois.[6]

4. See 1965 Ill.Rev.Stats. Ch. 73, § 766.

5. (1928), 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895.

6. Carroll v. Preferred Risk Ins. Co. (1966), 34 Ill.2d 310, 215 N.E.2d 801, 802, aff'g (1st Dist.1965), 60 Ill.App.2d 170, 208 N.E.2d 836, 839; Schmidt v.

Plaintiffs contend, in part, that Equitable charged a higher premium because of Jacobson's history of high blood pressure and that the risk of death because of existing arteriosclerosis was a part of the additional risk for which the increased premium compensated Equitable. This argument, if we understand it, presupposes a very high degree of causal relationship between the abnormally high blood pressure, which was known, and the general arteriosclerosis which was undoubtedly present—judged by hindsight, long before its presence was objectively determined in July and again in September. The experts all agreed, however, that there is no known causal relationship between high blood pressure and general arteriosclerosis except that, although persons with normal blood pressure may develop arteriosclerosis, and persons with high blood pressure may not, the latter are, statistically, somewhat more likely to do so. There was also testimony that a person with general arteriosclerosis is uninsurable.[7]

Plaintiffs correctly point out that Illinois law must govern the merits of this diversity case. They cite a number of decisions of the Supreme Court of Illinois and of the Appellate Courts.[8] All are distinguishable on their facts. None announce nor compel the conclusion that the doctrine of *Stipcich*, supra, is not part of the law of Illinois, and we do not distill from them any rule which conflicts with our analysis of the case before us.

In part, plaintiffs rely on disclosures made to Dorin with respect to Jacobson's condition in June as fulfilling all obligations Jacobson had to inform Equitable.

The parties do not dispute the proposition that ordinarily Dorin's knowledge would be imputed to Equitable.

Dorin testified that in June, 1961, he telephoned Jacobson about a golf date and that Jacobson declined to play because "his leg hurt him." Dorin asked him what he was doing about it and Jacobson said he was going to his personal physician, Dr. Powell. The following week, or ten days later, Dorin called Jacobson again about playing golf and Jacobson declined again because "his leg was still bad." In "the middle of June," Jacobson told Dorin that he was going to Dr. Shapiro, and that he turned him over to Dr. Javid, and "Dr. Javid told him he would have to have surgery on this leg to relieve nerve pressure which is causing the pain." On June 20, 1961, Dorin visited Jacobson in his office. He testified by deposition:

" 'A. Well, I told Mr. Jacobson— you know he wanted to wait until some time later with another company —and I told him that that may not be advisable in this particular case because anyone who goes into a hospital, that will be a long time before he gets —he may not get any insurance. You know, I just used that as a sales talk to deliver the policy. Up to that point, I didn't have any. I didn't think I had any chance to place it because of the high rating and because of his earlier statement that he said he wasn't going to consider any further insurance until the end of the year or some time later.

" ' *    *    *

" 'A. When I came into the room, I came in there about three o'clock in

Prudential Ins. Co. of America (1st Dist.1936), 287 Ill.App. 431, 5 N.E.2d 262, 266; Western & Southern Life Ins. Co. v. Tomasun (1934), 358 Ill. 496, 193 N.E. 451, 453.

7. Even if there were a jury question whether arteriosclerosis was a natural incident to or result of the high blood pressure, the jury verdict resolved it against plaintiffs. See Neuman v. New York Life Ins. Co. (3d Dist., 1934), 273 Ill.App. 288.

8. Johnson v. Royal Neighbors of America (1912), 253 Ill. 570, 97 N.E. 1084; Marshall v. Metropolitan Life Insurance Company (1950), 405 Ill. 90, 90 N.E.2d 194; Asselborn v. State Farm Life Ins. Co. (2d Dist.1954), 1 Ill.App.2d 104, 116 N.E.2d 902; Hungate v. New York Life Ins. Co. (4th Dist.1932), 267 Ill.App. 257; Luke Grain Company v. Illinois Bankers Life Association (2d Dist.1931), 263 Ill. App. 576; Mousette v. Monarch Life Ins. Co. (4th Dist.1941), 309 Ill.App. 224, 32 N.E.2d 1004.

the afternoon, and when I left it was closing time, and they were busy, and I stuck around. I wanted to finish it. I wanted to finish it one way or the other, and we went into the inner office, Myron, his dad, and myself. And I kept on saying, I said, "Look Mort, I didn't intend to press you for it. If you wanted to defer it until another time with another company, all right. But look, you are going into a hospital, you know," and I said—I explained him something in detail, the workings of an insurance company. "You know, they accumulate hazards against you. You have a little bit of that, you have families, history, you have something else." I said, "How sure are you that you are going to be able to get insurance after. It may be delayed a year or two."

" ' * * *

" 'I said, "Look, you take it or leave it. This is the ninth inning." I didn't tell him the expiration date was July 16. I wanted to close it right there and then because we handled it for five months already. And we sat around for a long time and finally we settled the case.' "

■ Dorin was told by members of the Jacobson family, after the operation, that the operation had been more serious than anticipated. The policies reached him shortly after that, and he delivered them. We do not think that Dorin's delivery of the policies after receiving this additional information could constitute a waiver of Equitable's defense, or estoppel of Equitable from asserting it. The contract had been formed, if at all, as of June 20,[9] and did not require Jacobson to be in good health on the date of delivery. The defense rested, in substance, on whether Jacobson had material information on June 20 which he misrepresented or concealed. The statements made to Dorin after the operation did not disclose that information had been withheld on June 20. If neither Dorin nor the company knew at the time of delivery that a defense existed at the time of payment of the first premium, delivery could hardly be a waiver of such defense or give rise to an estoppel.

It does appear that if Dorin had told Equitable's underwriting department (as Dorin had learned on or before June 20) that Jacobson was about to have surgery to relieve nerve pressure causing pain in his leg, the department would have asked for an investigation before acceptance of the premium, and an investigation would probably have disclosed the truth. Had the truth been learned, the testimony was that Jacobson would have been deemed uninsurable.

■ But we do not think estoppel or waiver can be asserted to excuse the insured for concealing the truth merely because the false information he gave might, if diligently checked upon, have led the insurer to the more damaging truth which the insured concealed.

■ We think the verdict can be sustained even though Dorin's knowledge be imputed to Equitable, as it normally would be. Equitable contended moreover, that under the circumstances Dorin's knowledge as of June 20 would not be imputed to it.

■ At Equitable's request, the court instructed the jury to the effect that where the applicant is acquainted with circumstances plainly indicating that the agent does not intend to advise the insurer, the general rule that the agent's knowledge is imputed to the principal does not apply.

This exception is supported by Mutual Life Ins. Co. v. Hilton-Green,[10] where the Supreme Court said:

"The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's inter-

---

9. The policy was issued June 30, but was in force by its terms as of June 20.

10. (1916), 241 U.S. 613, 622–23, 36 S.Ct. 676, 60 L.Ed. 1202.

est. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption,—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith and not as a shield for unfair dealing. * * * "

No Illinois cases have been found in conflict with that rule. Perhaps the jury could have inferred from all the circumstances that Jacobson knew that Dorin, who had dealt with him for years and who had been making such prodigious efforts to get the insurance put into effect would not "upset the applecart" by reporting adverse information to the company. But, as already said, the verdict can be sustained even if Dorin's knowledge were imputed to the company.

Plaintiffs complain that the instructions overemphasized the defenses claimed by Equitable and did not reflect plaintiffs' contentions that Equitable must be deemed to have waived or been estopped to raise its defenses. We do not consider their complaint well founded.

One distinct jury issue was whether the statement made by Jacobson the evening before he died and reported by the attending physician proved that Jacobson had suffered chest pains of sufficient impact so that his denial of known indications of chest pains was a false statement to the insurer. There was no contention that Equitable knew anything about chest pains, nor that there was any waiver or estoppel of this defense if it had merit. With respect to the blockage of the artery any possible jury issue boils down to whether Jacobson knew or should have known that this was a change so materially affecting the risk that he was obliged to inform the company, whether informing Dorin of the surgery for nerve pressure was reasonably the equivalent, and whether, if so, Dorin's knowledge was imputed to the company. It is true that these instructions did not follow that exact analysis, but we do not deem them misleading.

The court did say in two different parts of the instructions that the knowledge of Dorin would ordinarily be imputed to Equitable. We think the court made it clear enough that plaintiffs should recover if the material information reached or was imputed to Equitable without explaining such result in terms of waiver or estoppel.

The judgment appealed from is

Affirmed.